# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KANAT UMARBAEV, | : | |
|     Petitioner | : | |
| | : | No. 1:20-cv-00413 |
| v. | : | |
| | : | (Judge Kane) |
| WARDEN CRAIG A. LOWE | : | |
|     Respondent | : | |

**MEMORANDUM**

Petitioner Kanat Umarbaev ("Petitioner") is currently confined at the Pike County Correctional Facility ("PCCF"), a detainee of the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"). On March 10, 2020, Petitioner, then proceeding pro se, initiated the above-captioned action by filing a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 (Doc. No. 1), alleging that his continued detention by ICE had exceeded constitutional limits. Following an Order to show cause (Doc. No. 4), Respondent filed a response, contending that Petitioner's detention is lawful (Doc. No. 8). On March 30, 2020, counsel appeared on Petitioner's behalf. (Doc. No. 7.) On April 6, 2020, Petitioner filed a traverse supplementing his original § 2241 petition (Doc. No. 9) and a motion for expedited consideration and/or an emergency hearing raising an additional claim based upon the COVID-19 pandemic (Doc. No. 10). In an Order dated April 7, 2020, the Court directed Respondent to file a supplemental response addressing the arguments raised in Petitioner's traverse by 12:00 p.m. on April 8, 2020. (Doc. No. 11.) Respondent has done so. (Doc. No. 14.) Petitioner's § 2241 petition, therefore, is ripe for disposition. The Court will grant Petitioner's motion for expedited consideration (Doc. No. 10) to the extent that this Memorandum serves as the Court's expedited review of Petitioner's § 2241 petition (Doc. No. 1). For the reasons set forth below, Petitioner's § 2241 petition will be denied.

## I. BACKGROUND

### A. Petitioner's Immigration Proceedings

Petitioner is a native of the former Union of Soviet Socialist Republics ("USSR") and a citizen of Kyrgyzstan. (Doc. No. 8-1 at 12.) He was admitted to the United States on February 22, 2000, as a non-immigration visitor for pleasure. (Id.) Petitioner had authorization to remain in the United States until August 22, 2000. (Id.) On January 4, 2001, ICE issued a Notice to Appear, charging Petitioner with being removable pursuant to § 237(a)(1)(B) of the Immigration and Nationality Act ("INA") because he remained in the United States for a time longer than that permitted. (Id.) At a hearing before an immigration judge, Petitioner conceded his removability as charged. (Id.)

Thereafter, Petitioner filed applications for asylum and withholding of removal. (Id. at 9.) On March 14, 2003, an immigration judge denied Petitioner's applications for relief and ordered him removed to Kyrgyzstan. (Id.) On August 13, 2003, Petitioner was convicted in New York of driving while intoxicated ("DWI"). (Id. at 20.) On May 25, 2004, the Board of Immigration Appeals ("BIA") summarily dismissed Petitioner's appeal from the immigration judge's March 14, 2003 order because Petitioner had failed to file a brief or statement in support of his appeal. (Id. at 16.) On June 30, 2004, Petitioner sustained a second DWI conviction in New York. (Id. at 20.)

On August 28, 2019, a DHS Fugitive Operations Team apprehended and detained Petitioner. (Id. at 19.) ICE began taking steps to execute Petitioner's removal order, including requesting a travel document from the Embassy of Kyrgyzstan. (Id. at 4.) On October 8, 2019, Petitioner filed a motion to reopen his removal proceedings with the BIA. (Doc. No. 9 at 28-46.) Petitioner asserted that his recent conversion to Christianity, coupled with current conditions for

Christians in Kyrgyzstan, warranted reopening of his proceedings and supported a new application for asylum. (Id. at 28.) On December 15, 2019, DHS received a travel document for Petitioner from the Embassy of Kyrgyzstan and scheduled Petitioner for removal on January 3, 2020. (Doc. No. 8-1 at 4.) On January 2, 2020, the BIA denied Petitioner's request for a stay of removal pending consideration of his motion to reopen, stating that there was little likelihood that his motion to reopen would be granted. (Id. at 28.)

On January 3, 2020, DHS transported Petitioner to the John F. Kennedy International Airport to place him on a commercial flight to Moscow, Russia, with a connecting flight to Bishkek, Kyrgyzstan. (Id. at 5.) That same day, Petitioner filed a petition for review, along with an emergency motion for a stay of removal, with the United States Court of Appeals for the Second Circuit. (Id. at 30-39.) DHS attempted to place Petitioner on the airplane at the final boarding call. (Id. at 5.) Petitioner, however, "actively and physically fail[ed] to comply with ICE's orders by 'falling on the floor.'" (Id.) The removal attempt "was called off and [Petitioner] was removed from the airport and placed in the ICE transport vehicle." (Id.) Moments later, the Second Circuit granted Petitioner's emergency motion for a stay of removal. (Id. at 42.)

On January 21, 2020, DHS conducted a custody review and determined that Petitioner would remain detained pending a decision on his petition for review. (Id. at 44.) The DHS observed that Petitioner's final order of removal had been in effect since May 25, 2004 and that Petitioner had been an ICE fugitive from 2004 until 2019. (Id.) DHS also noted that Petitioner "ha[s] multiple convictions for driving under the influence." (Id.) DHS concluded that Petitioner posed "a flight risk and a significant public threat." (Id.)

3

Petitioner filed the instant § 2241 petition on March 10, 2020. (Doc. No. 1.) On March 16, 2020, an immigration judge conducted a bond hearing for Petitioner pursuant to Guerrero-Sanchez v. Warden York County Prison, 905 F.3d 208 (3d Cir. 2018). (Doc. No. 8-1 at 46.) The immigration judge denied Petitioner's request for a custody redetermination, concluding that Petitioner "remains a risk of danger to persons and property." (Id.) On March 24, 2020, Petitioner filed a motion for reconsideration of the immigration judge's decision. (Doc. No. 9 at 234-40.) That same day, Petitioner, through emails by counsel, requested that ICE release him from custody to "seek medical treatment for symptoms that may be related to the coronavirus." (Id. at 244.) Petitioner's counsel asserted that Petitioner was "experiencing a sore throat, shortness of breath[,] and [a] runny nose." (Id. at 245.) Counsel also noted that Petitioner "suffers from high blood pressure, which has not been well controlled during his detention." (Id.) On March 31, 2020, DHS denied Petitioner's request for release. (Id. at 244.) As of the date of this Memorandum and Order, Petitioner's motion to reopen is still pending before the BIA and his petition for review is still pending before the Second Circuit.

B.     **COVID-19 and Conditions at PCCF**

Coronavirus Disease 2019 (COVID-19) "is an infectious disease caused by a newly discovered coronavirus." See Coronavirus Overview, WORLD HEALTH ORGANIZATION, https://www.who.int/health-topics/coronavirus#tab=tab_1 (last accessed Apr. 8, 2020). The COVID-19 virus "is spreading very easily and sustainably between people." See How COVID-19 Spreads, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last accessed Apr. 8, 2020). "Most people infected with the COVID-19 virus will experience mild to moderate respiratory illness and recover without requiring special treatment." Id. However,

some infected individuals will experience severe illness, and certain groups, including "[o]lder people[] and those with underlying medical problems like cardiovascular disease, diabetes, chronic respiratory disease, and cancer" are at a higher risk of developing serious illness. See id. In the past few weeks, governments have imposed policies designed to curb the spread of COVID-19. For example, businesses deemed not life sustaining have been closed in Pennsylvania since March 21, 2020. See Order of the Governor of the Commonwealth of Pennsylvania Regarding the Closure of All Businesses that Are Not Life Sustaining, https://www.scribd.com/document/452416027/20200319-TWW-COVID-19-Business-Closure-Order (Mar. 19, 2020). Additionally, on April 1, 2020, Governor Wolf issued an order for individuals to stay home that applies to the Commonwealth of Pennsylvania in its entirety through April 30, 2020. See Order of the Governor of the Commonwealth of Pennsylvania for Individuals to Stay at Home, OFFICE OF THE GOVERNOR OF PENNSYLVANIA, https://www.governor.pa.gov/wp-content/uploads/2020/04/20200401-GOV-Statewide-Stay-at-Home-Order.pdf (Apr. 1, 2020). Since the onset of the pandemic, "ICE epidemiologists have been tracking the outbreak, regularly updating infection prevention and control protocols, and issuing guidance to field staff on screening and management of potential exposure among detainees." (Doc. No. 14-1 at 4.)

PCCF "has the capacity to house 375 detainees and has historically often operated near capacity." (Id.) As of April 3, 2020, "there were only 250 combined inmates and detainees housed a[t] the facility." (Id.) Upon admission, each detainee is screened for disabilities. (Id.) During "intake medical screenings, detainees are assessed for fever and respiratory illness, are asked to confirm if they have had close contact with a person with laboratory-confirmed COVID-19 in the past 14 days, and whether they have traveled from or through area(s) with

sustained community transmission in the past two weeks." (Id.) Those who "present symptoms compatible with COVID-19 will be placed in isolation, where they will be tested." (Id.) If a test is positive, that inmate remains isolated and treated and, if necessary, is referred to a local hospital. (Id.) As of April 4, 2020, four (4) ICE detainees at PCCF have tested positive for COVID-19, as have five (5) correctional officers. (Id. at 7.) The detainees are in quarantine under medical observation, and the correctional officers are under self-quarantine. (Id.)

In the case of known exposure to someone who has been confirmed to have COVID-19, "asymptomatic detainees are placed in cohorts with restricted movement for the duration of the most recent incubation period . . . and are monitored daily for fever and symptoms of respiratory illness." (Id. at 5.) Cohorting "is an infection prevention strategy" that "involves housing detainees together who were exposed to a person with an infectious organism but are asymptomatic." (Id.) This practice lasts for fourteen (14) days "because individuals with these and other communicable diseases can be contagious before they develop symptoms and can serve as undetected source patients." (Id.) Those who show "onset of fever and/or respiratory illness are referred to a medical provider for evaluation." (Id.) Cohorting "is discontinued when the 14-day incubation period completes with no new cases." (Id.) Pursuant to ICE policy, "detainees diagnosed with any communicable disease who require isolation are placed in an appropriate setting in accordance with CDC or state and local health department guidelines." (Id.)

PCCF has "instituted a modified lockdown schedule" in response to COVID-19. (Id. at 8.) Movement throughout the facility is restricted. (Id.) "Detainees['] ability to leave their cells is staggered in order to promote social distancing." (Id.) All detainees are required to maintain social distancing when not within the same cell, and meals are served to detainees within their

cells.  (Id.)  All staff members are required to wear masks.  (Id.)  "Daily temperature checks and screening for influenza like illness (ILI) symptoms have been implemented for all detainees." (Id.)  "If any detainee displays ILI symptoms, they[,] along with any cell mates, are placed in quarantine."  (Id.)  Staff have also "increased the frequency of cleaning and disinfecting, including often used touch surfaces."  (Id.)

    C. **Petitioner's Recent Medical History**

On April 1, 2020, Petitioner presented to the medical department at PCCF with upper respiratory complaints.  (Doc. No. 15 at 2.)  Medical staff noted that Petitioner was unable to take certain medications because of his history of high blood pressure.  (Id.)  Petitioner was prescribed Tylenol, an antihistamine, and cough medication.  (Id.)  At that time, Petitioner's temperature was 98.3 degrees.  (Id. at 8.)  Medical staff educated Petitioner on reporting worsening symptoms and increasing his fluid intake.  (Id. at 2.)

On April 3, 2020, Petitioner was placed into medical quarantine because of "possible" COVID-19 exposure.  (Id. at 3.)  Medical staff directed that his temperature be checked twice daily.  (Id.)  Any fever reducers were discontinued until the end of the fourteen (14)-day quarantine period.  (Id.)  On April 4, 2020, Petitioner complained that he had a sore throat.  (Id. at 7.)  Staff noted that he already had a cold pack, but that Tylenol and Motrin were unable to be used for his unit.  (Id.)  Petitioner's temperature on April 4, 2020 was 98.4 degrees at the first check and 97.6 at the second check.  (Id.)  Petitioner has not had a temperature over 98.9 degrees through April 7, 2020.  (Id. at 5-6.)

**II.** **LEGAL STANDARD**

Under 8 U.S.C. § 2241(c), a prisoner or detainee may receive habeas relief only if he "is in custody in violation of the Constitution or laws or treaties of the United States."  See 28

U.S.C. § 2241(c)(3); see also Maleng v. Cook, 490 U.S. 488, 490 (1989). Because Petitioner is currently detained within the jurisdiction of this Court and asserts that his continued detention violates due process, this Court has jurisdiction over his § 2241 petition. See Zadvydas v. Davis, 533 U.S. 678, 699 (2001); Spencer v. Kemna, 523 U.S. 1, 7 (1998).

## III. DISCUSSION

In the instant case, the parties do not dispute that Petitioner is currently detained pursuant to 8 U.S.C. § 1231(a), which provides for the detention of individuals who are subject to a final order of removal. See 8 U.S.C. § 1231(a); cf. Diouf v. Mukasey, 542 F.3d 1222, 1229-30 (9th Cir. 2008) (concluding that the alien petitioner was detained under § 1231(a) because his pending appeal and stay of removal did not entail judicial review of a removal order but instead involved review of the denial of a motion to reopen). That section provides that "[e]xcept as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." See 8 U.S.C. § 1231(a)(1)(A). During this ninety (90)-day period, "the Attorney General shall detain the alien. Under no circumstance during the removal period shall the Attorney General release an alien who has been found . . . deportable under section 1227(a)(2)." See id. § 1231(a)(2). After the ninety (90)-day period expires, the alien's detention may continue, or he may be released on supervision. See id. § 1231(a)(3), (6).

The Supreme Court has concluded, however, that § 1231 "limits an alien's post-removal-period detention to a period reasonably necessary to bring about the alien's removal from the United States. It does not permit indefinite detention." See Zadvydas, 533 U.S. at 698. Thus, "[o]nce removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." See id. at 699. To establish a uniform baseline, the Supreme Court concluded that a

period of six (6) months is a "presumptively reasonable period of detention." See id. at 701. Moreover, the United States Court of Appeals for the Third Circuit has concluded that "an alien detained under § 1231(a)(6) is generally entitled to a bond hearing after six months (i.e., 180 days) of custody." See Guerrero-Sanchez, 905 F.3d at 226. Following such a hearing, the alien "is entitled to be released from detention unless the government establishes that the alien poses a risk of flight or a danger to the community." See id. at 224 (quoting Diouf v. Napolitano, 634 F.3d 1081, 1092 (9th Cir. 2011)). "The Government must meet its burden in such bond hearings by clear and convincing evidence." See id. at 224 n.12.

As noted supra, Petitioner has been detained pursuant to § 1231(a)(6) since August 28, 2019. As of the date of this Memorandum, therefore, Petitioner has been detained for over seven (7) months, which is beyond the presumptively reasonable six (6)-month period set forth in Zadvydas and Guerrero-Sanchez. The parties do not dispute that on March 16, 2020, an immigration judge conducted a bond hearing pursuant to Guerrero-Sanchez and concluded that Petitioner should remain detained because he "remains a risk of danger to persons and property." (Doc. No. 8-1 at 46.) Petitioner, however, now asserts that he is entitled to habeas relief because: (1) the immigration judge violated his right to due process by applying the wrong legal standard, failing to afford the procedural safeguards mandated by Guerrero-Sanchez, and misapplying BIA precedent; and (2) his detention violates due process because "he is at higher than normal risk of serious illness or death if he contracts the COVID-19 virus and DHS is unable to mitigate the risk that he will be infected." (Doc. No. 9 at 22.) The Court considers each argument in turn.

A. Review of Petitioner's March 16, 2020 Custody Determination

On March 16, 2020, an immigration judge denied Petitioner's request for a custody determination. (Doc. No. 9 at 231.) The immigration judge noted that Petitioner's request was

9

brought pursuant to 8 C.F.R. § 1236 and denied his request, concluding that Petitioner "remains a risk of danger to persons and property." (Id.) Petitioner now asserts that the immigration judge violated his due process rights by applying the wrong legal standard and misapplying BIA precedent. (Id. at 10-16.) Respondent asserts that the Court lacks jurisdiction over Petitioner's claim because Petitioner failed to exhaust his administrative remedies. (Doc. No. 14 at 12-13.) For the reasons discussed below, the Court agrees with Respondent.

The Third Circuit has noted that requiring exhaustion of administrative remedies for habeas petitions fosters important goals because: "(1) allowing the appropriate agency to develop a factual record and apply its expertise facilitates judicial review; (2) permitting agencies to grant the relief requested conserves judicial resources; and (3) providing agencies the opportunity to correct their own errors fosters administrative autonomy." See Moscato v. Fed. Bureau of Prisons, 98 F.3d 757, 761-62 (3d Cir. 1996). "These very important purposes are frequently furthered by requiring aliens who receive a bond hearing before the immigration judge to exhaust their administrative remedies and raise any issues with the BIA prior to seeking federal habeas corpus relief." Chajchic v. Rowley, No. 1:17-cv-457, 2017 WL 4401895, at *3 (M.D. Pa. July 25, 2017), report and recommendation adopted, 2017 WL 4387062 (Oct. 3, 2017). In the instant case, the record before the Court reflects that on March 24, 2020, Petitioner filed a motion for reconsideration of the immigration judge's March 16, 2020 order denying his request for bond. (Doc. No. 9 at 234-40.) As of the date of this Memorandum and Order, that motion remains pending before the immigration judge. Thus, Petitioner's arguments regarding the alleged deficiencies in the immigration judge's orders have not yet been exhausted at the administrative level. Accordingly, to the extent Petitioner requests that the Court review the immigration

judge's March 16, 2020 order denying him bond, the Court lacks jurisdiction to do so at this time.[1]

B. **COVID-19 Claim**

Petitioner also maintains that his detention violates due process because he is at heightened risk of serious illness or death should he contract the COVID-19 virus. (Doc. No. 9 at 16-22.) Petitioner suggests that he is particularly unsafe because he is "an older person suffering from hypertension, high cholesterol[,] and possible immune compromising anemia." (Id. at 22.) Petitioner seeks immediate release, arguing that "DHS's inability to protect him and failure to release him amount to a life-threatening violation of his constitutional right to due process." (Id. at 22-23.)

As an initial matter, Respondent asserts that a § 2241 petition is not the proper vehicle for Petitioner's claim, maintaining that such a claim must instead be raised in a civil rights action. (Doc. No. 14 at 15-19.) While the issue of whether Petitioner may pursue such a claim in a § 2241 petition has not been resolved, the Court will examine his claim in the context of habeas corpus because Petitioner is seeking immediate release from confinement based upon the COVID-19 pandemic.[2] Nevertheless, for the reasons set forth below, the Court finds that

---

[1] In his § 2241 petition, Petitioner suggests that he is entitled to release pursuant to Zadvydas because his removal is not reasonably foreseeable. (Doc. No. 1 at 7.) Petitioner, however, presents no evidence to support this assertion, and he appears to abandon his Zadvydas claim in his traverse. Without any facts or evidence beyond conclusory allegations to support his Zadvydas claim, the Court will not grant relief on this ground. Petitioner, however, remains free to file a new § 2241 petition challenging his detention should he remain detained after he has exhausted his administrative remedies and may raise his Zadvydas claim again at that time.

[2] The Third Circuit has concluded that a habeas corpus petition is the proper vehicle for challenges to "the fact or length of confinement." See Tedford v. Hepting, 990 F.2d 745, 748 (3d Cir. 1993) (quoting Preiser v. Rodriguez, 411 U.S 475, 494 (1973)). A habeas petition is also the proper vehicle for challenging the "execution" of such confinement. See Woodall v. Fed. Bureau of Prisons, 432 F.3d 235, 241-42 (3d Cir 2005). When a petitioner seeks immediate

Petitioner has not demonstrated a likelihood of success on the merits for purposes of establishing entitlement to the requested injunctive relief.[3] "To establish a likelihood of success on the merits, a movant must produce sufficient evidence to satisfy the essential elements of the underlying cause of action." Pa. Prof'l Liab. Joint Underwriting Ass'n v. Wolf, 328 F. Supp. 3d 400, 407 (M.D. Pa. 2018) (citing Punnett v. Carter, 621 F.2d 578, 582-83 (3d Cir. 1980)). In

---

release from custody, the "sole federal remedy" lies in habeas corpus. See Preiser, 411 U.S. at 500.

  Respondents maintain that while the relief Petitioner requests may sound in habeas, his claim regarding unconstitutional conditions of confinement does not. The Third Circuit has stated that "a habeas attack on the conditions of confinement" is cognizable "only in extreme cases." See Ali v. Gibson, 572 F.2d 971, 975 n.8 (3d Cir. 1978), superseded by statute on other grounds as stated in Callwood v. Enos, 230 F.3d 627, 633 (3d Cir. 2000). As Chief Judge Conner of this Court recently noted, "[b]eyond the Third Circuit, a split has developed as to whether habeas corpus provides a remedy for a conditions-of-confinement claim that does not implicate the fact, duration or execution of the petitioner's confinement." See Camacho Lopez v. Lowe, No. 3:20-cv-563, 2020 WL 1689874, at *5 (M.D. Pa. Apr. 7, 2020) (citing cases). "This divide has been borne out in recent weeks, as courts across the country confront numerous habeas petitions citing the threat posed by the COVID-19 viral pandemic as a basis for immediate release." Id. Chief Judge Conner concluded that "certain extraordinary conditions of confinement may warrant a habeas remedy." See id.

  In Camacho-Lopez, Chief Judge Conner concluded that an ICE detainee at PCCF who had contracted COVID-19 and claimed that staff at PCCF were unable to provide adequate medical care had sufficiently stated "the extreme case in which habeas relief might be available." See id. at *6. He, therefore, permitted the petitioner to proceed via his § 2241 petition. See id. This Court has also permitted ICE detainees who sought release based upon an increased risk of contracting the COVID-19 virus to pursue habeas relief. See Thakker v. Doll, No. 20-cv-480, Doc. No. 47 at 5 (M.D. Pa. Mar. 31, 2020). While Petitioner has not tested positive for COVID-19, as noted above, he has been placed in quarantine for "possible" COVID-19 exposure. Accordingly, in light of Petitioner's allegations, as well as the Camacho Lopez and Thakker decisions, the Court will assume, for purposes of this Memorandum, that Petitioner may pursue his claims via his § 2241 petition.

[3] The Court recognizes that Petitioner has not explicitly requested injunctive relief in the form of immediate release because of the COVID-19 pandemic. In light of Petitioner's motion to expedite and his challenge to his conditions of confinement based upon COVID-19, however, the Court concludes that Petitioner's request for release is similar to those presented in the motions for temporary restraining orders presented to this Court in recent cases. See Camacho Lopez, 2020 WL 1689874, at *6-9; Hope v. Doll, No. 20-cv-562, Doc. No. 11 at 4-15 (M.D. Pa. Apr. 7, 2020); Thakker, No. 20-cv-480, Doc. No. 47 at 5-25 (M.D. Pa. Mar. 31, 2020). Thus, the Court finds it appropriate to discuss the likelihood of Petitioner's success on the merits of his claim.

determining whether such a showing has been made, a court "must examine the legal principles controlling the claim and the potential defenses available to the opposing party." See id. (citing BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 264 (3d Cir. 2000)).

In his motion to expedite, Petitioner asserts "that his right to Due Process under the Fifth Amendment is being violated due to DHS's inability to provide reasonable protection for his health and safety as a result of his detention in a facility, where at least four detainees under the jurisdiction of DHS and four staff members have tested positive for COVID-19, and at least one has been hospitalized with serious illness." (Doc. No. 10 at 2.) The Due Process Clause provides that the federal government shall not deprive any person "of life, liberty, or property, without due process of law." See U.S. CONST. amend. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." Zadvydas, 533 U.S. at 690. "[T]he Due Process Clause applies to all persons within the United States, including aliens, whether their presence is lawful, unlawful, temporary, or permanent." Id. at 693. The due process rights of a pretrial detainee "are at least as great as the Eighth Amendment protections available to a convicted prisoner." See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983). Civil immigration detainees "are entitled to the same due process protections" as pretrial detainees. See E.D. v. Sharkey, 928 F.3d 299, 306-07 (3d Cir. 2019) (citing Charles v. Orange Cty., 925 F.3d 73 (2d Cir. May 24, 2019); Chavero-Linares v. Smith, 782 F.3d 1038, 1041 (8th Cir. 2015); Belbachir v. Cty. of McHenry, 726 F.3d 975, 979 (7th Cir. 2013); Porro v. Barnes, 624 F.3d 1322, 1326 (10th Cir. 2010); Edwards v. Johnson, 209 F.3d 772, 778 (5th Cir. 2000)).

Petitioner's substantive due process claim may be viewed under the theory of deliberate indifference to serious medical needs. See Jones v. Wolf, No. 20-cv-361, 2020 WL 1643857, at

13

*3 (W.D.N.Y. Apr. 2, 2020) (addressing an immigration detainee's substantive due process claims pertaining to COVD-19-related risks under theories of deliberate indifference to serious medical needs and unconstitutional conditions of confinement). "The Supreme Court has held that 'deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment.'" Tate v. Wiggins, No. 19-1242, 2020 WL 882880, at *2 (3d Cir. 2020) (internal quotations marks omitted) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). Such claims asserted by pretrial detainees are evaluated under the same Eighth Amendment standard. See Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 581-82 (3d Cir. 2003); see also Bakhtiari v. Madrigal, No. 18-cv-38, 2019 WL 1531861, at *10 (evaluating such a claim asserted by a civil immigration detainee under the same standard). "In order to establish a violation of [a detainee's] constitutional right to adequate medical care, evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Natale, 318 F.3d at 582.

Additionally, Petitioner's claim may be viewed under the theory of unconstitutional conditions of confinement. See Jones, 2020 WL 1643857, at *3 (addressing an immigration detainee's substantive due process claims pertaining to COVD-19-related risks under theories of deliberate indifference to serious medical needs and unconstitutional conditions of confinement). In evaluating whether a pretrial detainee's conditions of confinement violate his substantive due process rights, "the proper inquiry is whether those conditions amount to punishment of the detainee." See Bell v. Wolfish, 441 U.S. 520, 535 (1979). "To determine whether challenged conditions of confinement amount to punishment, [a court must] determine[] whether a condition of confinement is reasonably related to a legitimate governmental objective." Sharkey, 928 F.3d at 307 (quoting Hubbard v. Taylor, 538 F.3d 229, 232 (3d Cir. 2008)). If the Court determines

14

that the condition is not so related, it "may infer 'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees qua detainees.'" See id. (quoting Hubbard, 538 F.3d at 232).

Upon review of the instant petition, the parties' arguments, and the applicable law, the Court finds that Petitioner has not demonstrated an entitlement to relief based on his assertion that his health and safety are at risk due to the presence of COVID-19 at PCCF. The Court notes that, in his traverse, Petitioner states that: he "is under a doctor's care for hypertension and high cholesterol"; "[h]e has a history of significant bleeding after a recent hip fracture that required emergency surgery"; "[d]uring his last doctor's visit before he was detained, Petitioner's hemoglobin levels were abnormally low, a sign of anemia, which can affect the immune system"; and that "[h]is doctor ordered further blood testing, colonoscopy, and upper endoscopy, which has not been performed due to his detention." (Doc. No. 9 at 10.) Respondent has stated, however, that "[t]he fact that [it] has taken proactive measures [with respect to COVID-19]—such as cohorting and modified lockdowns, social distancing, increased sanitation measures—indicates that [it] is not deliberately indifferent to the risk of infection." (Doc. No. 14 at 22.) Respondent adds that although Petitioner has reported respiratory issues and a sore throat, "[h]e is being checked at least twice daily and has not exhibited any symptoms that have not been treated." (Id. at 24.) As of April 3, 2020, Petitioner was placed in quarantine for "possible" COVID-19 exposure. (Doc. No. 15 at 3.) His medical records indicate that he has not had a temperature over 98.9 degrees through April 7, 2020. (Id. at 5-6.) Petitioner will remain in quarantine until fourteen (14) days have passed. (Id. at 3.) The Court finds Respondent's representations and exhibits persuasive and sees no reason to question them at this juncture.

Moreover, based on the record presently before the Court, the Court cannot conclude that Petitioner has demonstrated a deliberate indifference to a serious medical need. See Camacho Lopez, 2020 WL 1689874, at *7 (finding that the detainee-petitioner who had tested positive for COVID-19 did not demonstrate deliberate indifference where, prior to the detainee's hospitalization, his medical records "establish[ed] that [he] was being regularly monitored and appropriately treated"). Additionally, to the extent that Camacho Lopez is distinguishable from the instant case because in Camacho Lopez, the petitioner already tested positive for COVID-19 and had been hospitalized, while Petitioner in this case has not reported a positive test result, the Court finds that Petitioner is still not entitled to release based on the potential risk of contracting the virus. While the Court is sympathetic to Petitioner's health-related concerns, the Court must conclude that on the basis of the record before it, including Petitioner's specific medical needs, Respondent's response to those specific medical needs, as well as its response to the presence of COVID-19 at PCCF, Petitioner has failed to demonstrate a constitutional violation based on deliberate indifference to his medical needs.[4] Accordingly, the Court finds Petitioner's arguments in favor of release to be without merit.

The Court is mindful that its review raises the specter of disparate results. Like one of the petitioners in Thakker, Petitioner is past the age of forty (40), has some recorded history of

---

[4] Moreover, the Court notes the Third Circuit's recent commentary that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone" should not be viewed as a reason to order release from custody. See United States v. Raia, No. 20-1033, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020). While the Court in Raia considered the issue of release in the context of a motion for compassionate release by a defendant in a criminal case, this Court finds the Third Circuit's discussion persuasive in the case at bar, especially in light of the Court of Appeals' emphasis on the Bureau of Prisons' "extensive and professional efforts to curtail the virus's spread." See id. In a similar vein, as this Court has noted supra, Petitioner's place of detention—PCCF—has taken measures to combat the spread of the virus, specifically with regard to Petitioner. Accordingly, the Court finds that this point also warrants the denial of Petitioner's request.

treated hypertension, and has a self-reported history of high cholesterol.[5] These conditions may place him at a higher risk of experiencing complications should he contract COVID-19. See How COVID-19 Spreads, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last accessed Apr. 8, 2020). Though it may seem axiomatic, this fact does not ipso facto dictate relief from this Court. The ultimate question before the Court is not whether, on balance, Petitioner's health concerns outweigh the interests of the community in his continued detention. Rather, the critical question before this Court is whether Petitioner is entitled to relief under the demanding standards of the writ of habeas corpus. To exercise jurisdiction and empower relief, it must be clear to this Court that Petitioner has established a constitutional violation through deliberate indifference to a serious medical need. Notwithstanding the state of the entire record in some other case, under the facts now before this Court, it is not plain that PCCF has demonstrated deliberate indifference by failing to take reasonable steps to protect Petitioner from COVID-19 or to monitor and treat his medical symptoms. As is clear from the differing results in this very district, see Camacho Lopez, 2020 WL 1689874, at *6-9, Thakker, No. 20-cv-480, Doc. No. 47 (M.D. Pa. Mar. 31, 2020), habeas review is entirely individual. The success of each petition will depend not only on the circumstances of the petitioner before the Court, but also on a rapidly changing landscape that includes the state of the COVID-19 pandemic, current conditions in ICE facilities, and the evolving response by ICE and facility officials to medical needs.

---

[5] See Thakker, No. 20-cv-480, Doc. No. 47 at 2-3 (M.D. Pa. Mar. 31, 2020) (noting that some of the petitioners experienced the following conditions: leukemia; high blood pressure and cholesterol; kidney failure; diabetes; a compromised immune system resulting from a prior kidney transplant; and heart issues).

Each individual case requires the careful weighing of the medical needs of the individual against the safety of the community and the enforcement of federal laws. That balancing must occur not on federal habeas review but in the first instance before the immigration judge. This Court trusts that ICE will provide Petitioner the timely bond review to which he is legally and ethically entitled. When the immigration judge conducts this review, she will have available information that this Court does not, including current conditions at detention centers, such as population density, that bears on the risk to detainees, Petitioner's complete medical records, Petitioner's personal history as it informs the assessment of whether he is a flight risk and a danger to the community, and Petitioner's plan for relocation on release and available assurances of reappearance when the pandemic is ended.

## IV. CONCLUSION

For the foregoing reasons, Petitioner's motion to expedite (Doc. No. 10) will be granted to the extent that this Memorandum serves as expedited review of Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 (Doc. No. 1). The Court, however, will deny Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. (Doc. No. 1.) This denial, however, will be without prejudice to Petitioner's right to file a new § 2241 petition should he remain detained after he has exhausted his administrate remedies regarding his detention. An appropriate Order follows.